
Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | Amy St. Eve |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5184 | **DATE** | 4/7/2003 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. ROBERT L. HUMMEL, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐   Filed motion of [ use listing in "Motion" box above.]

(2)  ☐   Brief in support of motion due _____.

(3)  ☐   Answer brief to motion due_____.   Reply to answer brief due_____.

(4)  ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐   Trial[set for/re-set for] on _____ at _____.

(8)  ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
         ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■   [Other docket entry]   Enter Memorandum Opinion and Order granting in part and denying in part plaintiff's motion for summary judgment and denying defendants' motion for summary judgment. Status hearing to set trial schedule on remaining issues set for 4/25/03 at 1:30 p.m. before Judge Castillo in courtroom 2319.

(11) ■   [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | APR 08 200? | |
| | Notified counsel by telephone. | | date docketed | 90 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | 03 APR -7 PM 7:35 | date mailed notice | |
| JHC | courtroom deputy's initials | FILED-EOD 10 Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 00 C 5184 |
| ROBERT L. HUMMEL, ROBERT L. | ) | |
| HUMMEL CONSTRUCTION CO., INC., | ) | The Honorable William J. Hibbler |
| HDB DEVELOPMENT CORPORATION | ) | |
| (a.k.a. HDB JOINT VENTURE and/or | ) | |
| HUMMEL-DIOR PARTNERSHIP), DALE | ) | |
| BERGER, and DIOR REALTY, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, the United States of America, brings this civil action for injunctive relief and for

civil penalty against Defendants Robert L. Hummel, Robert L. Hummel Construction Co. Inc.,

HDB Development Corporation, Dale Berger, and Dior Realty, pursuant to the Clean Water

Act, 33 U.S.C. § 1251 *et seq.* (CWA). In its complaint, Plaintiff alleges that Defendants violated

the CWA by discharging pollutants into a federally protected wetland without prior

authorization. In response, Defendants claim that their activities were authorized, did not release

pollutants, and did not occur on a protected wetland. Both parties have filed for summary

judgment. For the reasons below, Plaintiff's motion for summary judgment is **GRANTED in

part** and **DENIED in part** and Defendants' motion for summary judgment is **DENIED**.

1



## I. Factual Background

A.      *The Parties*

Robert Hummel is the sole owner of Robert L. Hummel Construction Company, an

Illinois corporation whose primary business is house excavations.  From time to time, Hummel

Construction also performs underground work on sewer and water lines.  Robert Hummel is also

involved in a number of residential and commercial development partnerships, including HDB

Development Corporation (HDB). The general partners of HDB include Robert Hummel, Dale

Berger and Dior Realty (which is solely owned by Peter Di Iorio).  In 2000, HDB sold a

residential development project called Pheasant Ridge which it had developed from vacant

farmland.  Robert Hummel is also a partner in another residential development venture called

Long Grove 400.  The Long Grove 400 partnership owned a development project known as

Indian Creek Club located about one quarter mile west of HDB's Pheasant Ridge project.  It is on

this property that Plaintiff contends the CWA violations took place.

B.      *The Wetlands*

Long Grove 400's Indian Creek Club project is located on a wetland complex in Long

Grove, Illinois, which is part of Lake County.  A body of water called Sylvan Lake lies slightly

above and west of the complex.  A small stream, called the Sylvan Lake Drain, flows from Sylvan

Lake through the wetlands and joins another body of water called Indian Creek, which flows

east-southeast over part of the wetlands and into the Des Plaines River.  The Des Plaines River

flows into the Illinois River and eventually into the Mississippi River.

C.      *Regulatory Framework*

This country's wetlands are often subjected to a myriad of local, state, and federal

regulations to insure their continued ecological viability.  Federal authority over wetland

2

regulation derives in part from the CWA, an encompassing legislation designed to maintain the integrity of the Nation's waters. 33 U.S.C. § 1251(a). Of relevance here, the CWA prohibits discharges of any pollutants, including dredged or fill material, into protected wetlands unless authorized by a permit issued by the United States Army Corps of Engineers (Corps). 33 U.S.C. §§ 1311(a), 1344(a). The CWA's regulatory scheme does not reach each and every wetland. Rather, for the CWA to apply to a particular wetland, the wetland must fall within the CWA's definition of "navigable waters." 33 U.S.C. § 1344(a). The CWA broadly defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Corps regulations have expanded this definition to include, in relevant part:

> (1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
> (2) All interstate waters including interstate wetlands;
> (3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, the use, degradation or destruction of which could affect interstate or foreign commerce . . .;
> (4) All impoundments of waters otherwise defined as waters of the United States under the definition;
> (5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section;
> (6) The territorial seas;
> (7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section.

33 C.F.R. § 328.3(a).

Assuming a particular wetland falls within the above definition, owners and developers must obtain permission before engaging in activities that would disturb the wetland. Specifically, the Corps has regulatory authority to require permits for the discharge of dredged or fill material into the waters of the United States. 33 U.S.C. § 1344(a) (emphasis added). The Corps authorizes discharges through two types of permits: (1) individual permits, which must be applied

3

for on a case-by-case review; and (2) general permits, issued on a state, regional, or national basis, which authorize certain activities without requiring a permit application. 33 U.S.C. § 1344. General permits most often cover routine projects which are known to have minimal impact on wetlands. 33 U.S.C. § 1344(e). Once issued, the Corps also has the discretion to revoke, suspend, or modify general permits if necessary to further the public interest. 33 C.F.R. § 330.1(d).

The Corps retains significant discretion to grant or deny an applicant's permit. The more biologically functional the wetland, the more likely the Corps will prohibit potentially damaging development activity from occurring on the wetland. On occasion, the Corps will undertake to publically identify and designate those wetlands warranting extraordinary protection through a process call Advanced Identification or ADID. The ADID designations alert potential and current property owners and developers that they must overcome particularly onerous hurdles before engaging in activities that may disrupt the wetland.

D.    *1991-1993 ADID Study*

Starting in 1991, a number of federal, state, and local agencies conducted a study of Lake County, Illinois wetlands to identify ADID wetlands (the ADID Study). The ADID Study used aerial photography, computer mapping, and site visits to determine which of Lake County's wetlands were deserving of extraordinary protection. The ADID Study identified approximately 200 sites, including the wetland on which Long Grove 400's Indian Creek Club Project is located, that it deemed unsuitable for discharges of pollutants. To develop the ADID Study, the Corps issued public notices, solicited comments, and held a public meeting regarding the proposed ADID designations. On February 1, 1993 the Corps issued a second public notice announcing the finalization of the ADID Study and published its findings in a Record of Decision and Final

4

Report, which summarized the ADID Study's technical aspects. Also, concurrent with the finalization, the Corps announced that it was eliminating certain nationwide permits for the sites identified in the ADID Study.

E. *Defendants' Activities*

From on or about January 26, 1998 to January 29, 1998, Hummel Construction installed a 15" sanitary sewer line through part of their Indian Creek Club project in a roughly one-acre area the parties refer to as "Outlot A". The new sewer runs along an existing sewer line through the wetland, connecting from an upstream manhole at the northeast corner of Gilmer Road and Midlothian Road to a manhole in the middle of the wetland and then to a manhole located on a road crossing at Cripple Creek Road, in city of Long Grove, Lake County, Illinois. To accomplish the sewer installation, Hummel Construction dug a trench approximately 525' feet long and 30" wide and 3' deep, placing dirt and wetland plants to the side. Using a backhoe, Hummel Construction then removed and crushed an old sewer line from the trench. After installing new 15" pipes, Hummel Construction packed and sealed the trench with the previously sidecast dirt, plants, and pieces from the old pipe and regraded the wetland.

A few days before performing the sewer installation in Outlot A, Hummel Construction installed a 73' section of 15" sewer line through another section of the Indian Creek Club property referred to by the parties as "Outlot B" which is located east of the road crossing at Cripple Creek Drive. Hummel Construction's employee, Tim Stephens, testified that he installed the new sewer through Outlot B in the "exact same way" he installed the sewer through Outlot A except that he did not remove and crush an old pipe during the installation.

While Hummel Construction was working on the larger of the two sewer lines, an employee of the local stormwater management commission drove by and observed the sewer

5

installation. He reported Defendants' activities to the Corps which issued a cease and desist order requiring Defendants to mitigate the wetland violations and to install a new sewer line outside of the wetland. When Defendants refused to implement the order, the Corps referred the matter to the Department of Justice which brought the present lawsuit. Plaintiff claims that Defendants violated the CWA because they did not obtain a permit from the Corps before discharging pollutants into a federally protected wetland. Defendants deny that a permit was required for the sewer installation and deny that the Corps has jurisdiction over the wetland at issue. Both parties have filed motions for summary judgement.

## II. Standard of Review

Summary judgment is proper where "the pleading, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). When presented with cross-motions for summary judgment, the court considers the motions simultaneously and draws all reasonable inferences in favor of the party opposing a particular motion. *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992), *aff'd*, 9 F.3d 1198 (7th Cir. 1993).

## III. Analysis

The Corps asserts jurisdiction over Outlots A and B (Sewer Sites) because they are located on wetland that is connected to a tributary of the Des Plaines River, a navigable water of the United States (Sewer Site wetland). The Corps maintains that Defendants' sewer installation

6

activities discharged pollutants into the Sewer Site wetland in violation of the CWA. Also, the Corps claims that Defendants' activities were not authorized because Defendants did not apply for an individual permit to install the sewer and the ADID Study eliminated all nationwide permits for activities causing discharges on the Sewer Site wetland.

Defendants disagree and argue that the Sewer Site wetland lies outside the Corps' jurisdictional reach because it lies too far away from an actually navigable water to be considered "waters of the United States." Alternatively, Defendants argue that even if the Sewer Site wetland is subject to the Corps' jurisdiction, the sewer installation did not "discharge" any "pollutants" as those terms are defined by the CWA. Finally, Defendants claim that the sewer installation was authorized by nationwide permit and the Corps, therefore, cannot establish a violation.

Thus, the parties' cross-motions raise four separate matters. Each party seeks summary judgment on the same issues. First and foremost, the Court must address whether the Corps had jurisdiction over the Sewer Site wetland. Second, the Court must determine whether the sewer installation "discharged pollutants" into the wetland as those terms are defined in the CWA. Third, the Court will address whether Defendants' activities were authorized by nationwide permit. Lastly, the Court will determine which, if any, of the named Defendants is liable.

A.     *Corps Jurisdiction*

Only those wetlands that fall within the CWA's definition of "navigable waters" are subject to the Corps' regulation and permitting requirements. Defendants portray the Sewer Site wetland as a relatively isolated wetland, far outside the CWA's definition of navigable waters. Defendants' expert admits that Sewer Site wetland is adjacent to a body of water called Indian Creek, which is a tributary of the Des Plaines River, a navigable-in-fact water. Defendants

7

maintain, however, that this hydrological connection to a navigable-in-fact water is not sufficient to bring the Sewer Site wetland within the Corps' jurisdiction. Rather, Defendants argue that only wetlands that are themselves navigable or are *directly adjacent* to navigable-in-fact waters are included within the CWA's definition of navigable waters. In defense of their position, Defendants primarily rely on the United States Supreme Court's decision in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*). According to the Defendants, after *SWANCC*, only those waters that are themselves navigable or are *directly adjacent* to navigable waters are subject to the Corps' jurisdiction. Since the Sewer Site wetland does not meet either criteria, Defendants claim that it cannot fall within the Corps' jurisdiction.

The Corps, on the other hand, argues that because the Sewer Site wetland is adjacent to a tributary of a navigable-in-fact water, the wetland is sufficiently connected to a navigable water to place it within the CWA's definition of "waters of the United States." The Corps disagrees that the *SWANCC* decision limited its jurisdiction as articulated by Defendants. The Corps also notes that many lower courts both before and after *SWANCC* have found hydrological connections to navigable waters, such as are present here, sufficient to establish the Corps' jurisdiction.

The CWA extends to all "navigable waters" which are defined as "the waters of the United States." 33 U.S.C. § 1362(7). The requisite hydrological connection between the waters described in the Corps' regulations and actually "navigable waters" has received considerable attention from the courts, including the United States Supreme Court. *See Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985). The *Riverside* Court established that waters

8

that are not themselves navigable but are *directly adjacent* to actually navigable waters fall within the

CWA's reach. *See Riverside Bayview Homes*, 474 U.S. at 137. Sixteen years after *Riverside*, the

Supreme Court again addressed the scope of the Corps' jurisdiction under the CWA. *SWANCC*,

531 U.S. at 159. The *SWANCC* Court invalided an expansive regulation called the Migratory Bird

Rule that gave the Corps jurisdiction over bodies of water that were visited by migratory birds even

if the bodies of water themselves had no surface or subsurface connection to navigable water. *Id.* at

174. The Court clarified that, although the waters themselves do not need to be actually navigable

to come within the CWA's definition of "waters of the United States," they cannot be *isolated*

*intrastate waters* with no discernable connection to navigable waters. *Id.* at 168.

Contrary to Defendants' position, the Supreme Court's holding did not attempt to define

precisely how connected a particular body of water must be to a navigable water to receive CWA

protection. The Seventh Circuit's recent statement in *United States v. Krilich*, 303 F.3d 784, 791 (7th

Cir. 2002), recognized this limit. Regarding *SWANCC*'s effect on CWA jurisprudence, the

Seventh Circuit stated that:

> "the Supreme Court merely held that the definition of 'waters of the United States'
> under 33 C.F.R. § 328.3(a)(3), as clarified by the Migratory Bird Rule, 'exceeds
> the authority granted to [the Corp] under § 404(a) of the CWA. This limited
> holding does not represent a significant change in the law . . . ."

*Id.* at 791 (internal citations omitted). Moreover, this interpretation accords with that of the

majority of courts to consider issue. *See Headwaters, Inc. v. Talent Irrigation District*, 243 F.3d 526,

533 (9th Cir. 2001); *United States v. Lamplight Equestrian Center, Inc.*, 2002 WL 360652, *6 (N.D. Ill.

2002); *United States v. Rueth*, 189 F. Supp. 2d 874, 877 (N.D. Ind. 2002); *United States v. Buday*,

138 F. Supp. 2d 1282, 1287-88 (D. Mont. 2001); *Colvin v. United States*, 181 F. Supp. 2d 1050,

1055 (C.D. Cal. 2001); *but see United States v. Rapanos*, 190 F. Supp. 2d 1011, 1014 n.3 (E.D. Mich.

2002) (noting that *SWANCC* "likely" represents a "significant shift in the [Supreme Court's] CWA jurisprudence."); *United States v. Newdunn*, 195 F. Supp. 2d 751, 767 (E.D. Va. 2002) (same).

Defendants rely of the Fifth Circuit's decision in *Rice v. Harken Exploration Co.*, 250 F.3d 264 (5th Cir. 2001), to support its position that after *SWANCC* only wetlands that are themselves navigable or are *directly adjacent* to navigable waters are within the Corps' jurisdiction. First, this Court is bound by Seventh Circuit precedent; the Fifth Circuit has no precedential effect on this Court. *Colby v. J.C. Penny Co., Inc.*, 811 F.2d 1119, 1123 (7th Cir. 1987). Second, while the court in *Rice* does appear to interpret *SWANCC*'s holding more expansively than the other circuits, the court's statements were primarily dicta as the court was mainly concerned with preventing the Corps from extending its jurisdictional reach to discharges into *groundwater* that might eventually find navigable water. *Id. at* 272. Thus, the court had no occasion to discuss the limits of the Corps' jurisdiction over waters with observable connections to navigable waters.

In assessing whether bodies of water amount to navigable waters, courts have seized upon the Supreme Court's statement in *SWANCC* that "it was the *'significant nexus'* between the wetlands and 'navigable' waters' that informed our reading of the CWA in *Riverside Bayview Homes*." *SWANCC*, 531 U.S. at 167 (emphasis added); *See, e.g., Lamplight Equestrian Center*, 2002 WL 360652 at *6. In other words, the party asserting the Corps' jurisdiction over a particular body of water must establish a "significant nexus" between the body of water and a navigable water. If the complaining party cannot demonstrate such a connection, then the body of water cannot be included among those waters protected by the CWA.

Many courts, both before and after *SWANCC*, have found connections to navigable waters similar to the present case sufficient to establish jurisdiction. *See Headwaters, Inc. v. Talent Irrigation District*, 243 F.3d 526 (9th Cir. 2001) (man-made irrigation canals that emptied into streams flowing

10

to navigable waters); *United States v. Edison*, 108 F.3d 1336 (11th Cir. 1997) (sewer drain flowing to drainage ditch to drainage canal that emptied into a tributary of Tampa Bay); *United States v. TGR Corporation*, 171 F.3d 762 (2nd Cir. 1999) (drain to storm waters discharge system to tributary of navigable water); *United States v. Ashland Oil and Transp. Co.*, 504 F.2d 1317 (6th Cir. 1974) (unnamed tributary flowing through three other waterways before reaching a navigable river); *United States v. Rueth Development Corporation*, 189 F. Supp. 2d 874 (N.D. Ind. 2002) (wetland "which has an affect" on flows to ditch which ultimately led to navigable river); *United States v. Buday*, 138 F. Supp. 2d 1282 (D. Mont. 2001) (tributary 235 miles from navigable water); *United States v. Lamplight Equestrian Center, Inc.*, 2002 WL 360652 (N.D.Ill. 2002) (non-continuous meandering drainage swale that carried water off the property to a tributary of a tributary of a navigable water). In sum, cases both before and after *SWANCC* have found that a body of water need not have a direct connection to navigable water, but may be linked through other connections two or three times removed from the navigable water and still fall within the Corps' jurisdiction.

Applying the above principles to the present case the Court finds that the Sewer Site wetland falls within the Corps' jurisdiction. There is no dispute of material fact as to the factual predicate for this jurisdiction -- the Sewer Site wetland is adjacent to a tributary, Indian Creek, of traditionally navigable water, the Des Plaines River. Although the Sewer Site wetland is two steps removed from an actually navigable water, the Court finds a significant nexus exists to establish jurisdiction.

B.    *Discharge of Pollutants*

Defendants argue that even if the Sewer Site wetland falls within the Corps' jurisdiction, the sewer installation did not cause a "discharge" of "pollutants," as those terms are defined by the CWA. Defendants claim that Plaintiff cannot allege any set of facts demonstrating a regulable discharge and therefore ask the Court to find that they did not violate the CWA as matter of law.

11

Plaintiff argues that Defendants' activities did in fact "discharge" "pollutants" and similarly claims that Defendants cannot allege any set of facts that would demonstrate otherwise. Accordingly, Plaintiff also seeks summary judgment on this issue.

The material facts surrounding the sewer installation are not in dispute. The testimony of Defendants' employee, Tim Stephens, the individual who performed the sewer installation in both Sewer Sites, confirms that two trenches were dug through the wetland, one 525' feet long and other 73' feet long. Also, Stephens' testimony confirms that Defendants placed the materials excavated from the trenches, which included dirt and wetland plants, back into the wetland to seal and close the trenches. To determine whether these activities constitute a "discharge" of "pollutants" it is necessary to look to the definition of a number of terms.

The CWA prohibits "the discharge of any pollutant" into federally protected waters without a permit from the Corps. 33 U.S.C. §§ 1311(a), 1344(a). The statute defines the word "discharge" as "any addition of any pollutant to navigable waters from any point source[1]." 33 U.S.C. § 1362(12). The term "pollutant" means, *inter alia*, "dredged spoil . . . biological materials . . . rock, sand [and] cellar dirt." 33 U.S.C. § 1362(6). Although the Corps' regulations do not define "dredged spoil," they define "dredged material" as "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). Additionally, the Corps defines "the discharge of dredged material" as "any addition of dredged material into, including any redeposit of dredged material other than incidental fallback within, the waters of the United States." 33 C.F.R. § 323.2(d)(1). In sum, to demonstrate an actionable discharge of pollutants under the CWA, one

---

[1]A point source is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Examples include: bulldozers, backhoes, and other equipment commonly used during excavation and mechanized land clearing. *Avoyelles Sportsman's League v. Marsh*, 715 F.2d 897, 922-923 (5th Cir. 1983).

12

must demonstrate an (1) addition of (2) a pollutant (including dredged material, rock and celler dirt) into protected waters.

Defendants argue that they did not add pollutants to the wetland when installing the new sewer. Rather, they claim they only churned up the soil that was already there and then placed it back basically where it came from. Defendants maintain that the word "addition," as commonly understood, requires the introduction of *new* material or an *increase* in material already present. Defendants claim that because they did not introduce any new material (besides the harmless 15" sewer piping) into the wetland and because the sewer replacement did not result in a net increase in material present in the wetland, there can be no "addition" of a pollutant. While this argument has surface appeal, it is ultimately unconvincing and inconsistent with the substantial weight of authority holding that intentional redeposits of material into the same wetland constitute an "addition" of a pollutant.

The Fourth Circuit addressed this very issue in *United States v. Deaton*, 209 F.2d 331 (4th Cir. 2000). In *Deaton*, a property owner alleged that the Corps could not regulate "sidecasting," which is "the deposit of dredged or excavated material from a wetland back into that same wetland." *Id.* at 334. The property owner asserted that "sidecasting results in no net increase in the amount of material present in the wetland" and therefore could not constitute the "addition of a pollutant." *Id.* at 335. The Fourth Circuit squarely rejected this argument:

> Contrary to what the Deatons suggest, the statute does not prohibit the addition of material; it prohibits the "addition of any pollutant." The idea that there could be an addition of a pollutant without the addition of material seems to us entirely unremarkable, at least when an activity transforms some material from a nonpollutant into a pollutant, as occurred here . . .Once [earth and vegetable matter] was removed [from the wetland], that material became "dredged spoil," a statutory pollutant and a *type* of material that up until then was not present on the Deaton property. It is of no consequence that what is now dredged spoil was previously present on the same property in the less threatening form of dirt and vegetation in an

13

undisturbed state. What important is that once that material was excavated from the wetland, its redeposit in that same wetland *added* a pollutant where none had been before.

*Id* at 335-36.

The *Deaton* Court's understanding of the word "addition" is the same as that of nearly every other circuit to consider the question. *See Borden Ranch Partnership v. United States Army Corps of Engineers*, 261 F.3d 810, 815 (9th Cir. 2001), *aff'd per curiam*, 123 S. Ct. 599, 154 L.Ed.2d 508 (2002) (digging deep trench through wetland discharged pollutants); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir. 1983) (holding the word "addition" may be reasonably understood to include "redeposit"); *United States v. M.C.C. of Florida, Inc.*, 772 F. 2d 1501, 1506 (11th Cir. 1985) (redeposit of spoil churned up by tugboat propellers constituted a discharge of a pollutant under the CWA), *vacated and remanded on other grounds*, 481 U.S. 1034, *readopted in relevant part*, 848 F.2d 1133 (11th Cir. 1988); *Rybachek v. EPA*, 904 F.2d 1276, 1285 (9th Cir. 1990) (dirt and gravel extracted by gold miners and redeposited into the stream bed from which it was extracted constituted an "addition" of a pollutant under the CWA). This Court agrees.

In defense of their position, Defendants characterize the dredged material resulting from its trenching activities as merely "incidental fallback" which is authorized by the Corps' regulations. *See* 33 C.F.R. § 323.2(d)(1); *see also National Mining Assoc. v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1404 (D.C. Cir. 1998) (finding that "the straightforward statutory term 'addition' cannot reasonably be said to encompass the situation in which material is removed from the waters of the United States and a small portion of it happens to fall back."). But Defendants' sewer installation involved more than mere "incidental fallback." The dredged soil did not wind up back in the wetland by happenstance. Rather, Defendants admit that they consciously and purposely redeposited the dredged materials to pack and seal the open trench.

14

There is no dispute of material fact that Defendants dug trenches through the wetland, sidecast the resulting dirt and vegetation, and then redeposited this dredged material into the trenches to cover the new sewer pipes. The Court finds that these activities constitute a "discharge of pollutants" as those terms are defined by the CWA. Once the Defendants removed dirt and vegetation, that material became "dredged spoil," a statutory pollutant and a type of material that up until then was not present on the wetland. Its redeposit in that same wetland *added* a pollutant within the meaning of the CWA.[2]

C. *Permit*

Defendants final argument to avoid CWA liability is that the sewer installation was authorized by nationwide permit which allowed replacement of sewer lines. In their briefs, the parties expend considerable effort arguing about whether certain nationwide permits authorized the specific type of activity that accompanied the sewer installation. The Court need not address this dispute, however, because the record conclusively demonstrates that at the time Defendants installed the new sewer, the Corps had eliminated nationwide permits for all activities involving potential discharges on the Sewer Site wetland.

As previously discussed, the CWA authorizes the Corps to issue nationwide permits for categories of activities involving discharges that have minimal adverse environmental effects. 33 U.S.C. § 1344(e)(1). CWA regulations further provide that the Corps also has the discretion to modify, suspend, or revoke such permits for relevant factors of the public interest. 33 C.F.R. § 330.5 (emphasis added). The regulations set forth specific procedures the Corps must follow before

---

[2]Because the Court finds Defendants' soil redepositing activities sufficient to constitute a discharge of pollutants under the CWA, there is no need to address the Corps' additional claim that Defendants also introduced "fill material" into the wetland.

eliminating nationwide procedures which include public notice, comment periods, public meeting, and published findings supporting the revocation. *Id.* In the present case, the record confirms that the Corps eliminated nationwide permits for activities occurring on the Sewer Site wetland. *See* Public Notice, Discretionary Authority Over Lake County ADID Wetlands, February 1, 1993, ¶ 1. The record also reveals that the reason the Corps revoked nationwide permits for such activities was because the Sewer Site wetland was identified as a wetland in need of extraordinary protection by the Corps' ADID Study.[3] Despite this, Defendants insist that the nationwide permits were alive and well when they installed the new sewer.

> 1.    Publication

Defendants claim that the Corps acted improperly in designating the Sewer Site wetland an ADID wetland and eliminating nationwide permits because the Corps did not publish its ADID announcement and nationwide permit elimination in the Federal Register as required for "administrative rule-making" under Administrative Procedure Act (APA). *See* 5 U.S.C. § 553. Defendants' argument fails for two reasons. The ADID Study is not an example of "administrative rule-making" subject to the APA, but rather an *advisory* notice to the public. As the Notice of Finalization for the ADID Study states:

> This ADID does not alter the existing permit application process, but rather simplifies it by giving the public an advance indication of the probability of receiving a permit.

Also, the regulations granting the Corps discretion to eliminate nationwide permits only require the Corps to issue public notices, solicit comment, hold public hearings, and publish its findings before

---

[3]Defendants dispute that the smaller of the two sewer sites was made part of the ADID wetland, but offers no clear evidence to support their contention. Plaintiff supports its claim that both sewer sites are within the ADID by referring the Court to a wetland delineation performed on Defendants' behalf showing both sites within the ADID boundaries. Defendants' unsupported denials are insufficient to create a dispute of material fact on this issue.

revoking nationwide permits. 33 C.F.R. § 330.5. Here, as more fully discussed below, the record demonstrates that the Corps fully complied with these requirements before revoking the nationwide permits affecting Defendants' property. Nothing in the regulations required the Corps to publish their decision in the Federal Register and Defendants have not pointed to any authority supporting their argument.

2.      The Corps Did Not Abuse Its Discretion

Defendants also claim that the Corps abused its discretion when it included the Sewer Site wetland in the ADID Study and eliminated the nationwide permits affecting the site.    Essentially, Defendants are asking this Court to review and overturn certain Corps' decisions regarding the ADID Study and nationwide permit revocation.

As the CWA does not specify the standard of review for Corps decisions, the Court looks to the APA for the appropriate standard. Under the APA, a court cannot overturn a decision of an agency unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). Moreover, the standard of review is a highly deferential one and the court will not substitute its own judgment for that of the agency. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The record demonstrates that the ADID Study was a cooperative effort between several local, state, and federal agencies to inventory, evaluate and map high quality wetland resources in Lake County, Illinois. *See* ADID Study Final Report, Nov. 1992, pp. 1,5. In addition to these agencies, a technical steering committee including the Corps, U.S. Department of the Interior, Lake County Health Department, and the Illinois Department of Conservation provided technical advice for the Lake County Study. *Id.* at pp. 3-4. The committee used Lake County wetland inventory and flood plain maps to identify those wetlands most likely to provide water quality and stormwater

17

storage values. *Id.* at pp. 5-22. Also, the committee identified ADID wetlands by extensively analyzing existing wetland, soil and water resource maps and information, and state databases of threatened or endangered species. *Id.* Once the data was collected, the committee identified those wetlands in need of extraordinary protection. The ADID Study identified the wetland in which the Sewer Sites are located and designated it ADID Wetland #143. According to the ADID Study's Summary Sheet, this wetland was identified because it showed high quality biological values (state threatened or endangered species, and high quality stream) and other significant ecological characteristics.

Additionally, the Corps' procedures to notify the public of the ADID Study appear thorough and appropriate. The Corps announced the ADID Study through public notice that solicited comments on their proposal to designate certain Lake County wetlands, including the Sewer Site wetland, as ADID. Months later, the Corps issued a detailed final report including summaries of each individual wetland proposed for ADID designation. Lastly, the Corps issued a second public notice attaching maps displaying ADID wetland locations. These extensive efforts to notify the public to encourage comments which were incorporated into the study's finding further belie Defendants' claim that the ADID Study was the result of arbitrary and capricious decision-making.

For the above reasons, the Court concludes that the Corps did not abuse its discretion or act arbitrarily or capriciously when it performed and finalized the ADID Study and concurrent nationwide permit elimination. This decision is based on the extensive administrative record presented by the parties which demonstrates that the ADID Study was thoroughly performed and adequately announced to the public. Lastly, the Court is hesitant to overturn an agency decision, completed over ten years ago, regarding matters within such agency's expert domain. *See Marsh v. Oregon National Resources Council*, 490 U.S. 360, 378 (1989).

18

In sum, the Court finds that there is no dispute of material fact as to whether the Defendants violated the CWA. First, the undisputed facts establish that the Corps properly asserted jurisdiction over the Sewer Site wetland. Second, the uncontroverted testimony of Defendants' employee demonstrates that the sewer installations activities constituted a "discharge" of "pollutants" as those terms are defined by the CWA. Lastly, the Court finds that Defendants did not have authorization to perform the sewer installation because the Corps had properly eliminated nationwide permits affecting the Sewer Site wetland when publishing the ADID Study in 1993. As the undisputed facts demonstrate that Defendants violated the CWA by discharging pollutants into a federally protected wetland without authorization, the Court grants Plaintiff's motion for summary judgement. The sole remaining issue raised by the parties' motions is which of the named Defendants should bear liability for the violation.

D. *Liability*

In this lawsuit, Plaintiff names four potential targets for liability. Robert Hummel hired Hummel Construction to perform the sewer installation. Hummel Construction actually performed the digging that released pollutants into the wetland. The final target, HDB Development Corp and its general partners, Dale Berger and Dior Realty (HDB), are named because, according to Plaintiff, the sewer installation was completed on behalf of and for the benefit of HDB's Pheasant Ridge development project located a quarter mile west of the Sewer Sites.

Plaintiff argues that all named Defendants should share the liability. To support this position it highlights testimony from numerous depositions purporting to implicate all Defendants in the illegal activities. Also, Plaintiff submits various financial documents, including an invoice from Hummel Construction to HDB for the sewer installation work, to solidify the connection between the unauthorized discharges and the HDB partnership. In response, Defendants deny that any of

the named parties are responsible for the violations. Rather, they direct the blame towards the Lake County Public Works Department (Lake County), which they claim owned the actual property (in the form of a sewer easement) that was impermissibly disturbed by Defendants' sewer replacement and also authorized Defendants to perform the activities. Alternatively, Defendants assert that even if Robert Hummel and Hummel Construction are appropriate targets, a dispute of material fact exists whether HDB authorized the sewer installation or benefitted from the new sewer.

To address this final dispute, the CWA's language's provides the starting point. Section 1311(a) provides that "the discharge of any pollutant by any *person* shall be unlawful." 33 U.S.C. § 1331(a)(emphasis added). The term "person" means "an individual, corporation, [or] partnership . . . ." 33 U.S.C. § 1362(5). Thus, according to the CWA's plain language, the proper target is the *discharger*, which can take the form of an individual, partnership, or corporation. Also, civil liability under the CWA is strict. *Kelly v. United States Environmental Protection Agency*, 203 F.3d 519, 522 (7th Cir. 2000). Therefore, the discharger's knowledge is irrelevant. *Id.*

### 1. *Lake County Public Works Department*

Lake County is not named in this lawsuit. Because Defendants have expended considerable effort trying to shift blame toward Lake County, the Court will briefly address its culpability. Defendants present evidence that Lake County owned the actual property, in the form of a sewer easement, on which Hummel Construction installed the new sewer. Also, Defendants offer deposition testimony claiming that Lake County approved the sewer installation and observed the replacement without objection. These facts, however, do not relieve Defendants' liability for the actual violations. Defendants offer no evidence that Lake County performed any part of the sewer installation or that they hired or paid Hummel Construction to perform the activities. Accordingly, as Lake County cannot be cast as a "discharger" under any set of facts, Defendants' attempts to pin

liability upon it must fail.[4]

### 2. Robert Hummel and Hummel Construction

Defendants claim that liability cannot attach to Robert Hummel individually because he did not operate the backhoe which discharged pollutants. Defendants then argue that Hummel Construction cannot be liable either because it was a mere "instrumentality" of Robert Hummel. These attempts to evade liability are unconvincing. It is undisputed that Robert Hummel hired and directed Hummel Construction to perform the sewer installation. Under traditional principals of agency law, Hummel Construction was therefore the agent of Robert Hummel. *See* Restatement (Third) of Agency § 2.04 (Tentative Draft No. 2, 2002). As an agent, acts undertaken in the scope of their authority or employment are attributable to the principle. *Id; see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 756 (1998). The illegal discharges into the wetland by Hummel Construction were certainly within the scope of its employment and authority and are therefore attributable to its principle, Robert Hummel. *See, e.g., Buxton v. United States Environmental Protection Agency*, 961 F. Supp. 6, 10 (D.D.C. 1997) (applying agency law to find civil liability under the CWA). Moreover, the fact that Robert Hummel did not himself operate the "point source" is immaterial. *See Friends of the Sakonnet v. Dutra*, 738 F. Supp. 623, 630 (D.R.I. 1990) (operator of "point source" does not, by itself, establish source of liability). Accordingly, Robert Hummel's liability is beyond dispute.

Hummel Construction's liability is also established because it was the actual "discharger." Hummel Construction operated the backhoe or "point source" which *directly* caused the violation.

---

[4]The Court also notes that testimony from the Lake County official involved in the project, explains that he assumed Defendants would get the necessary permits before disturbing the wetland. Thus, even if Lake County did authorize the sewer installation, such authorization appeared to be contingent on Defendants following the law.

Defendants argue that Hummel Construction was a mere "instrumentality" with no responsibility for permitting and operated without knowledge of any environmental regulations. These arguments ring hollow because, for civil enforcement proceedings, the CWA is a strict liability statute. *Kelly*, 203 F.3d at 522 (7th Cir. 2000).

### 3. HDB and its General Partners Dale Berger and Dior Realty

Unlike the above two defendants, the liability of HDB and its general partners, Dale Berger and Dior Realty, is disputed and inappropriate for this Court decide at the summary judgment stage. As previously discussed, the HDB partnership owned a development, Pheasant Ridge, located approximately one quarter mile from the Sewer Site wetland. Plaintiff claims that the sewer installation, while ordered by Robert Hummel, was performed on HDB's behalf. According to Plaintiff, the new sewer allowed HDB to hook its Pheasant Ridge project to the Lake County's main sewer line and thus increased the value of the Pheasant Ridge properties. Because Robert Hummel is a general partner of HDB, Plaintiff contends that his actions are attributable to the entire partnership including its other general partners, Dale Berger and Dior Realty. In contrast, Defendants claim that Robert Hummel's decision to install the new sewer was made without authorization and not in the ordinary course of HDB's business. They claim that HDB did not benefit from the sewer installation and would not have approved such a project. Both sides offer testimony and evidence supporting their respective positions. Plaintiff presents substantially more evidence than Defendants in this regard including: (1) evidence that HDB *paid* Hummel Construction to perform the work, (2) Hummel's admissions that the reason he performed the work was "to upsize the sewer for Pheasant Ridge" and (3) Hummel's admissions that the waste disposal capabilities provided by the new sewer benefitted Pheasant Ridge by making it easier to sculpture the individual lots. On the other hand, Defendants offer testimony that HDB's partners had no

22

knowledge of the project, did not approve the project, and that the project was performed outside the ordinary course of HDB business. This conflicting testimony creates a dispute of material fact which precludes the Court from granting summary judgement on the issue of HDB's liability.

## IV. Conclusion

In summary, the Court finds that no dispute of material facts exists regarding Robert Hummel's and Hummel Construction's liability under the CWA. The liability of HDB and its general partners, Dale Berger and Dior Realty, remains disputed and requires resolution at trial. For the above reasons, Plaintiff's motion for summary judgment is **GRANTED in part** and **DENIED in part** and Defendants' motion for summary judgment is **DENIED.**

IT IS SO ORDERED.


April 7, 2003

Amy J. St. Eve
United States District Court Judge